ELLIS, Judge.
This suit was instituted by the plaintiffs, Barnhill Brothers, Inc. and C. E. Williams Construction Co., Inc., against the defendant, Louisiana Department of Highways, alleging that the defendant was indebted unto the plaintiffs in the sum of Ninety-eight Thousand Seven Hundred Sixty-six and S3/100 Dollars ($98,766.53) for failure to pay the balance due on a contract entered into between plaintiffs and defendant on March 31, 1960, on State Project No. 25-08-20, Summer Grove-Shreveport Highway, Route La. U.S. 171.
Plaintiffs and defendant executed a stipulation of certain facts which were entered into the record prior to the trial of the case in District Court. The agreed stipulation of fact is as follows:
“1. That on March 31, 1960, a contract was entered into between the plaintiffs and the defendant for the construction of State Project No. 25-08-20, entitled Summer Grove-Shreve *651 port Highway, Route La.-U.S. 171, Parish of Caddo, consisting of 3.082 miles of Portland Cement concrete pavement; that the original contract amount was Nine Hundred Twenty-five Thousand Three Hundred 'Ninety-nine and 59/100 Dollars ($925,399.59) which amount was increased by virtue of ‘extra work orders’, etc, during the period of construction to a total sum of Approximately Nine Hundred Eighty-five Thousand and no/100 Dollars, ($985,000.00); That certain of these amounts have been paid by the defendant to the plaintiffs and due credit has been given therefore; that should the plaintiffs be held by the Court to be entitled to judgment in this case, then it is stipulated and agreed that the proper amount of that judgment is the full sum of Ninety-four Thousand Nine Hundred Ninety-nine and 84/100 Dollars ($94,999.84), together with legal interest from judicial demand until paid and for all costs of this suit.
“2.' That the contractors, plaintiffs herein, pursued to execute the contract with due diligence and within the time allowed by said contract and did, on August 9, 1961, submit said project for final inspection; that same was inspected by the defendant on that date and that all of the project was acceptable to the defendant with the exception of the overpass over the T & P Railway; that the defendant refused to accept the overpass over the T & P Railroad because it could not be used for the purposes intended; that the entire project would have been accepted and payment made therefor had it not been for the deteriorated condition of those portions of the overpass in which Class ‘Y’ concrete was used on that date.
“3. That all of the drawings, plans and specifications for this project were prepared by the defendant and its agents, reviewed by the United States Department of Commerce, Bureau of Public Roads, and furnished to the contractors and that they, the said contractors, followed them.
“4. That the contract was performed by the plaintiffs with the defendant’s employees performing their functions of supervision and inspection as set forth in the Standard Specifications for Roads and Bridges, dated July, 1955, which said publication was made a part of the contract between the plaintiffs and defendant, and specifically as set forth in said publication in Sections 5.07, 5.08 and 5.09.
“5. That prior to the construction of the project the defendant sampled, tested and approved, as being in accordance with plans and specifications, all of the component materials that went into the construction of the overpass.
“6. That the defendant furnished to the contractors, and/or to the supplier of the contractors, the mix design for the Class ‘Y’ concrete that was used in the project and that the contractor and/or the supplier of said contractor followed it.
“7. That the locations, dimensions and details of the finished work conformed strictly to the approved plans.
“8. That to the best of the knowledge, information and belief of the defendant, the contractors performed the contract, insofar as material used and workmanship performed, as was required by the plans and specifications furnished them, without deviations therefrom.
“9. That the pouring of the Class ‘Y’ concrete on the overpass was commenced on or about October 11, 1960, and the pouring of the last span of ‘Y’ concrete was completed about December 27, 1960; that the overpass was opened to traffic about February 2, *652 1961, and upon traffic using it, cracking of the Class ‘Y’ concrete appeared; the overpass was closed to traffic June 20, 1961, by the defendant and the cracked portions were patched and an ''extra work order’ issued therefore; that the overpass was then reopened to ■traffic about July 5, 1961, and the cracking became progressively worse; that as of August 19, 1961, the cracking was of such extent that the defendant’s engineers considered said overpass to be unsafe and it was closed to traffic on that date and has been closed ever since; the contractor was ordered to crack out and replace all of the decking, walkways and handrails in which fhe Class ‘Y’ concrete was used, at the contractors expense; that the contractors refused to do so.
"10. That, to the best of the information, knowledge and belief of the defendant, there were no deviations from the plans and specifications insofar as material or workmanship on the part of the contractor, its agents or employees, on this project.
"11, That a-new contract was let for cracking out and replacing of the Class ‘Y’ concrete on this project; that the new contract was for the total sum of Eighty-nine Thousand Four Hundred Sixty and-02/100 Dollars ($89,460.02).
"12. That the plaintiffs made a formal request to the defendant that Caddo Lightweight Aggregate Company be approved as a supplier of lightweight aggregate material; that a sample of this material was submitted to the defendant whereupon the Department tested the lightweight material and said material passed the standard tests made by the defendant and was approved as an acceptable lightweight material.”
The contract entered into between the plaintiffs and defendant provided withholding five per cent (5%) of the contract price until full completion of the contract and its acceptance by the Department of Highways. Plaintiffs contend that all the work was completed under the contract on August 9, 1961, and the completed project was submitted to defendant for its final inspection and acceptance. Defendant refused to accept the project as completed because the concrete decking and concrete handrail on the overpass over the T & P Railroad, which had been constructed of Class ‘Y’ Concrete in accordance with the specifications, has cracked and deteriorated when the State project was opened to traffic. Defendant called upon plaintiff to tear out and remove all the cracked concrete decking and concrete handrail from the overpass and replace it at their own expense. Plaintiffs refused to comply with the demand and defendant advertised for bids and awarded this contract to Minden Concrete Company for the contract amount of $98,406.02.
Plaintiffs then brought this suit to recover the balance claimed under its contract alleging that it had faithfully performed all the work called for by the contract in strict accordance with its plans and specifications and under the supervision and direction of defendant’s authorized agents and engineers.
The trial court rendered judgment in favor of plaintiffs and against defendant in the sum of $94,999.84. From this judgment the State of Louisiana through the Department of Highways has appealed.
It is amply demonstrated by the record both the plaintiffs and the defendant did everything required to obtain a satisfactory job on the construction of the overpass, yet it was defective. The Highway Department contends that the defective work was not due to any fault or insufficiency of the plans or specifications, and yet admits that the plaintiffs performed all their work without deviating from the requirements of the plans and specifications. ■ The legal question to be resolved is who is legally obligated to bear the cost of the replacement of the cracked and deteriorated portions of the project.
*653 The record indicates that the contract, the plans and the specifications were wholly-prepared and written by the defendant and plaintiff had no part whatsoever in their preparation; the plans and specifications set forth the methods of construction and the type of material to be used. Plaintiffs submitted samples of its products to be tested and approved by defendant. The mix design for the lightweight concrete was furnished by defendant and the ready mix plant was checked by defendant as to the weights of the various ingredients, as well as the amount of water, and it was found that the ready mix design furnished by defendant was followed throughout; the mix specifications were approved by defendant, and plaintiff followed the plans and specifications without any deviation as to either material or workmanship.
It is established without question that there was no evidence or knowledge of defect by either plaintiff or defendant prior to the project being opened to traffic, nor was there any evidence that either plaintiff or defendant should have known of the defects.
Although the expert witnesses for the State testified that the plans and specifications for the replacement of the structure were identical to the plans and specifications followed by plaintiff in its original construction, the general manager of Braswell Industrial, the supplier of the lightweight aggregate material, testified that there were differences in the mix design. He testified that additional cement was being added to the mix and approximately ten per cent (10%) sand per sack of cement had been added to the mixture.
Since the law between parties who have made their bargain by legal written contract is contained therein, we must now look at the contract to determine the rights and obligations of the parties.
The Standard Specifications for Roads and Bridges, July 1955, a part of the contract in question, provides for complete inspection of the work performed throughout construction, and to report whenever it appears that materials furnished and work performed by the contractor fail to fulfill the requirements of the contract and to call to the attention of the contractor any failure, but not relieving the contractor from any obligation to perform all of the work in accordance with the requirements of the contract,[1] It is further provided that failure to reject or condemn defective work or materials at the time it is done will in no way prevent its rejection whenever it is discovered. Provision is also made for inspection by removing or uncovering portions of the work to determine if the required specifications are met.[2]
Sirfiply stated, the contention of the defendant is that the undertaking of the plaintiffs is unqualified in that they agreed to complete the contract in accordance with the plans and specifications; that plans and specifications specifically provide that the contractor shall replace defective work prior to the acceptance of the project; that this is so even though the defective work results from the following of the plans and specifications. In support of this, counsel for defendant relies upon the case of Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819 (1949). In this case, Brasher contracted with the City of Alexandria to construct a sewer system. The city engineer furnished plans and specifications to Brasher and supervised the job. During the course of construction the contractor *654 was confronted with a serious soil condition necessitating', in his opinion, the use of extra material in the form of concrete cradles instead of wooden hoards as called for in the specifications. The contractor applied to the city engineer for a written order to correct the condition but the latter refused on the grounds that it was the contractor’s obligation to stabilize the pipe. As a result of the use of wooden braces, a portion of the sewer line collapsed and the city thereafter employed another contractor to make the proper repairs and deducted this cost from Brasher’s estimate. Brasher subsequently filed suit for the amount deducted from his contract and the Supreme Court on rehearing denied his claim. The Court held that if the owner, through its architect or engineer, is regarded as having superior expert knowledge, and on the basis of such knowledge, to represent to the builder the feasibility of carrying out the plans, the owner must be held responsible for the consequences of any defect in them. However, the Court stated that ia this case Brasher, the contractor, was an expert in the construction of sewer lines and that the City cannot be said to have expert knowledge at its disposal. The Court further stated “the record discloses that, when unstable soil conditions were encountered, all parties realized and knew the cradling was necessary to stabilize the pipe for the completion of the sewer, and the contractor knew the best manner for stabilizing the trench bottom and the proper method of preparing the cradling for this purpose.” Therefore, the work encountered did not involve any work requiring technical engin-neering skill not possessed by the contractor.
We feel that the Brasher case is clearly distinguishable from the present case. Clearly, the city had no superior expert knowledge as to the feasibility of carrying out the task defectively performed by the contractor. Both the city and the contractor were well aware of the defective manner in which the work was performed. In the instant case, it is not questioned that both plaintiff and defendant were not aware of any defect, nor was it shown that either should have been aware of a defect. As set out in the Brasher case, “the general rule is that, if destruction of a work during the course of construction is caused by defective, inadequate or insufficient plans and specifications furnished by the owner, the contractor is, nevertheless, liable * * * an exception to this rule is recognized where the owner expressly or impliedly warrants the sufficiency of the plans furnished by him.”
To determine the case where the owner expressly or impliedly warrants the sufficiency of the plans furnished by him the Court in the Brasher case stated:
“Williston, a well recognized authority on contracts, states and discusses this rule and its exception as follows:
“ ‘Even though the plans upon which a contractor undertakes to construct a building are so defective as to cause the building to fall while in course of erection, he is not generally relieved from liability.
“ ‘The propriety of these decisions depends upon the question whether the owner can be regarded as warranting the sufficiency of the plans. If the owner through his architect or engineer can be regarded as having superior expert knowledge, and on the basis of such knowledge to represent to the builder the feasibility of carrying out the plans, the owner must be held responsible for the consequences of any defects in them. In ordinary cases, perhaps, the builder may be supposed to have sufficient knowledge of what is feasible to make unfounded the assumption of justifiable reliance by him on the superior knowledge of another; but where the work in question involves technical engineering skill, and the plans are made by expert professional men engaged by the owner, there seems good reason for implying a warranty.
*655 “ ‘Though the builder may be liable if he fails, by reason of defective plans furnished him, to complete work which he has undertaken, yet if he can and does complete it according to the plans he is not liable for subsequent inferiority, injury, or destruction of the work, due to the defective character of the plans.’ * *
It is our opinion that the present case clearly falls within the exception to the general rule. It certainly involves technical engineering skill of the highest order to direct the plans and specifications for a bridge or overpass. Plaintiff had no bridge department manned by expert bridge engineers concerned solely with bridge design and construction. Further, plaintiff did not have a testing laboratory manned by competent technical personnel, nor did plaintiff have expert professional men engaged by defendant to prepare the plans and specifications.
Although counsel for the defendant strenuously contends that the plans and specifications furnished to the plaintiff were not defective and that the trial court was in error in presuming that the plans and specifications were defective, counsel admits that the structure was defective through no defect in workmanship or material furnished by plaintiff. Be this as it may, for it is our opinion that defendant impliedly warranted the sufficiency of their plans and specifications, that plaintiff complied in every detail with the plans and specifications, and in so doing fulfilled his obligations under the contract.
We are further of the opinion that Act 183 of 1958 [3] is applicable to the present case. This Act provides that no contractor shall be liable for destruction, deterioration, or defects in any work constructed if the work is according to plans and specifications furnished to him which he did not make or cause to be made, and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. Although the only evidence of defect or insufficiency in the plans and specifications was that of the furnisher of aggregate material who testified that substantial changes were made in the aggregate used in the original construction and that used in the subsequent construction, we feel that this is sufficient to establish that the deterioration occurred as a result of the plans and specifications. Counsel for plaintiff contends that Act 183 of 1958, if held applicable to this case, was specifically waived by the provisions of the contract. In support of this contention counsel states that the contract specifically provided that the plaintiffs would replace all defective work as required by defendant prior to the final acceptance of the structure. It appears that counsel for defendant is defining defective work as any defect even if called for by the plans and specifications. We are constrained to disagree with counsel for it is our opinion that defective work as set out in the contract is work not performed in accordance with the plans and specifications. Plaintiffs performed all work according to the plans and specifications, and it was through no fault of theirs that deterioration occurred.
For the reasons above assigned, the judgment appealed from is affirmed.
Affirmed.

. Division I, paragraph 5.08.

. Division I, paragraph 5.09. This paragraph further provides, “Should the work thus exposed or examined prove acceptable, the uncovering or removing, and the replacing of the covering or making good of the parts removed, shall be paid for as ‘Extra Work’ but should the work so exposed or examined prove unacceptable, the uncovering or removing, and the replacing of the covering or making good of the parts removed, shall be at the contractor’s expense.”

. During the regular session of the 1960 Legislature, Act 84 of 1960 was passed for the purpose of amending and re-enacting Act 183 of 1958, which is now LSA-R.S. 9:2771. Act 84 of 1960 is identical to Act 183 of 1958 with the exception of the last sentence, “[t]he provisions of this Section shall not be subject to waiver by the contractor.”