178 So.2d 312 (1965)
PITTMAN CONSTRUCTION COMPANY, Inc.
v.
The CITY OF NEW ORLEANS.
No. 1887.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1965.
Rehearing Denied September 27, 1965.
Writ Refused November 8, 1965.
*313 Gerald J. Gallinghouse, J. Richard Reuter, Jr., and Arthur C. Reuter, New Orleans, for plaintiff-appellee-appellant.
Alvin J. Liska and Joseph H. Hurndon, New Orleans, for defendant-appellant.
Deutsch, Kerrigan & Stiles, A. Morgan Brian, Jr., New Orleans, for David W. Godat, third-party defendant-appellant.
Albert J. Flettrich, New Orleans, for S. K. Whitty & Co., Inc., intervenor-appellee.
Before REGAN, YARRUT, and BARNETTE, JJ.
YARRUT, Judge.
Pittman Construction Company, Inc. (Pittman), as the general contractor, sued the City of New Orleans (City), as the owner, to recover $86,980.67, plus 5% interest from judicial demand, and all court costs, as the balance due for the erection of a project, known as the "Algiers Refuse Incinerator," located on a site near the intersection of Hendee and Anson Streets, near the approaches of the Mississippi River Bridge, in the Fifth Municipal District (Algiers) of New Orleans. The structure was to be a 200-ton daily capacity incinerator of the pit-and-crane type, complete with building, crane, ash and air handling facilities, furnaces, grates, a truck maintenance and storage facility, and certain sitework-paving, grading and drainage. The whole project was to cost $704,213.00 and Pittman was awarded the contract after competitive bidding for the major structural part at a net base price of $444,200.00.
Pittman alleges it completed all work required by the contract in strict accordance with plans and specifications furnished by the City, under the constant on-site supervision and approval of the City's consulting engineers, and is entitled to recover all contract funds due it by the City; plus $29,999.90 as the fair value of two items of extra work: (1) $26,576.94 for remedial pile work; and (2) $3,422.96 for installation of concrete gutter in maintenance garage; that the extra piling work was rendered necessary by serious latent unstable soil conditions encountered during construction that rendered the City's plans and specifications defective and inadequate; all work having been done under protest in compliance with the City's revised plans and specifications.
The City answered denying any indebtedness to Pittman, charging that Pittman failed to perform the work in accordance with the contract; then reconvened against Pittman for $33,783.81 as the cost of "remedial work," removal of floating concrete slabs and the construction of new slabs upon structural supports. The City then alternatively filed a third-party action against David W. Godat d/b/a David W. Godat & Associates (Godat), the City's engineers and supervisors, to recover the same claims for "remedial work" sought by *314 Pittman, together with any amount awarded Pittman against the City.
A petition of intervention was filed by S. K. Whitty & Co., Pittman's pile-driving subcontractor, to recover $16,666.83 from Pittman and the City. The City denied any liability to Whitty, and Pittman answered that their subcontract bound Whitty to them, as it is bound to the City under the prime contract.
The district judge, after a trial lasting five days, entailing more than 1000 pages of testimony, both expert and lay, and numerous documents consisting of the construction contract, the plans and specifications, and considerable correspondence between all parties, rendered judgment in favor of Pittman and against the City for $85,763.56, consisting of $55,763.66 earned contract funds retained by the City; $29,999.90 additional for extra work composed of $26,576.94 for remedial pile work and $3,422.96 for installing concrete gutter, plus 5% interest from January 25, 1963 (date of judicial demand) until paid, and all costs. Pittman's other claims have been abandoned.
Intervenor Whitty was awarded judgment against Pittman for $16,666.83. While the City's reconventional demand for $33,783.81 against Pittman was dismissed, the City obtained judgment against Godat in its third-party action for $60,360.75, $26,576.94 of which is for remedial pile work, and $33,783.81 for remedial concrete slab work.
The City appealed from the judgment in favor of Pittman. Godat, third-party Defendant, appealed from the judgment in favor of the City; and Pittman from the judgment in favor of Whitty.
At the outset we must conclude that the site for construction of the incinerator was selected by the City's representatives; that, after repeated conferences, the entire project was designed by Godat, the City's consulting engineers who prepared the plans and specifications in cooperation with the City's own engineer; that the construction work was performed under, and subject to, the continuous and constant supervision and direction of Godat; that the contract required Pittman to perform the work in strict accordance with the plans and specifications, which prescribed in minute detail the work to be done; the sequence of operations; and the methods, ways and means by which the work was to be accomplished; that immediately on receipt from the City's engineers of a notice to proceed, Pittman commenced the construction, and proceeded promptly with the execution of the work; that, during an early stage of construction, serious latent and unstable subsurface soil conditions were encountered, which Pittman immediately called to the attention of the City's representatives and Godat, who had stationed a resident engineer on the project for continuous supervision of Pittman's performance.
Godat finally approved and accepted the work as having been done in strict accordance with the plans and specifications, and recommended that the City make final payment to Pittman.
As his reasons for judgment in favor of Pittman the district court concluded that Pittman had performed the entire project in strict accordance with the plans and specifications; that Pittman had encountered serious latent unstable soil conditions during the construction; that the design of the project was defective, and the plans and specifications were faulty and insufficient with respect to piling, and floating concrete slabs; and the floating concrete slabs and resulting damage were due to the insufficiency of the City's plans and specifications; and LSA-R.S. 9:2771, as amended by Act 84 of 1960, relieved Pittman of liability, which statute reads:
"No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, *315 deterioration or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor." Acts 1958, No. 183, § 1, as amended Acts 1960, No. 84, § 1.
Before the execution of the construction contract, Godat made a careful and complete study of all available technical material on the design, construction, and operation of municipal refuse incinerators built in the United States since 1950; and inspected ten incinerators in other cities.
On September 23, 1960, Godat delivered to the City's Director of Sanitation, who substituted for the City's regular engineer who was ill, ten copies of his preliminary report dated September 21, 1960 which described the proposed incinerator facilities, with detailed cost estimates. On October 31, 1960 Godat submitted to the same City representative a full report about his studies and inspections of incinerator facilities, with his conclusions and recommendations for the Algiers incinerator.
In a letter dated November 7, 1960, the City's representative instructed Godat to proceed with final preparation of plans and specifications for an incinerator of two alternate types: (1) a traveling grate, or (2) a cylindrical furnace.
On January 11, 1961 the City employed the Eustis Engineering Company to make a limited subsoil investigation of the site. The Eustis firm made three soil borings in the presence of an engineer of the Godat firm; and, after completing its investigation, Eustis submitted to the City and Godat a written report.
On about May 15, 1961 the Godat firm completed two separate sets of plans and contract documents and, "in order to afford the City maximum economy in construction costs," Godat advertised and invited bids for several alternate proposals.
Eleven bids were received by the City. The lowest combination-bid, totalling $811,400, exceeded the appropriation for the project, so the City rejected all bids.
The Godat firm then revised the plans and specifications to reduce the cost of the project. Pittman then submitted the lowest bid ($456,000) for part of the work covering construction of the traveling grate plant.
After deducting various credits offered for alternates, the City accepted the lowest responsible respective bid for each of the three parts of the project, and executed separate contracts for an aggregate of $704,213, of which Pittman's was for $444,200. Work orders were then issued to the respective bidders by the City through Godat.
After work began, Godat reported that the test piles were driven by Pittman to the tip elevations shown on the drawings, as prescribed in the soils report of the Eustis Engineering Company, and were load tested by the Shilstone Testing Laboratory during the early part of September 1961; that, as a result of failure of one of the test piles, each of the foundation piles beneath the incinerator building was increased six feet in length.
After all piles had been driven in accordance with plans and specifications by S. K. Whitty Company, Inc., Pittman's subcontractor, Pittman then, with Godat's approval, started excavating for the storage pit and foundations by the "open cut" alternative method permitted by the plans and specifications.
Latent unstable subsurface soil conditions were encountered during the excavation and a "shear" failure occurred that resulted in lateral movement of the soil to an apparently deep depth in the area of the excavation, causing a displacement of many piles.
*316 To avoid further damage, Pittman, at its own expense, promptly drove steel piling around the excavation and stabilized the sides of the pit.
In view of these unexpected developments, Godat stopped the construction work and prepared three new sets of plans for remedial pile work involving substantial changes in their original design.
Pittman was then instructed to resume construction at its own expense. When Pittman's request for appropriate change orders, made as required by the contract, were denied, Pittman notified the City it would do the extra work under protest, but reserved the right to recover additional compensation therefor.
Pittman then completed all remedial pile work to the satisfaction of Godat in accordance with Godat's revised plans, and proceeded with the other construction work.
In December, 1961 Pittman wrote both to the City's representatives and Godat expressing concern about possible defects in the design of the floating concrete slabs, due to the latent unstable subsurface soil conditions; and, in a series of oral discussions and written correspondence, warned Godat and the City representatives that the slabs could be expected to settle and cause considerable damage if installed in accordance with the plans and specifications; and suggested the plans and specifications be changed to provide for their construction on structural supports.
The City and Godat ignored Pittman's warnings, refused to change their design, and ordered Pittman to install the floating concrete slabs without structural supports in strict accordance with the original plans and specifications.
The floating slabs began to settle soon after they were laid. By July 27, 1962 the slabs had settled so much that the plumbing subcontractor protested to Pittman that the sunken slabs endangered the plumbing underneath; which protest Pittman forwarded to Godat, and referred Godat to its previous letters warning against the unsupported floor slabs.
As the slabs settled, extensive damage was done to the masonry walls and other parts of the building. Pittman again wrote to Godat calling attention to the damage done to the masonry work by the settlement of the floating slabs.
On November 29, 1962 Pittman notified Godat that the work was ready for final inspection and acceptance, and requested Godat to make final inspection, in response to which, on December 4, 1962 Godat inspected the work, found it satisfactory for final acceptance by the City and, in a letter to the City, officially certified that Pittman had completed the project in accordance with plans and specifications.
The City officials did not approve Godat's recommendations but decided, after an inspection on December 10, 1962, not to accept the project because of damage done by sunken slabs.
On December 31, 1962 the City requested Pittman to submit a price for the removal of the floating concrete slabs and installation of new slabs on structural supports, in accordance with new plans prepared by Godat, but Pittman explained it could not submit a price for this so-called "remedial work" made necessary by defects in the plans and specifications, as the "Public Works Law" (LSA-R.S. 38:2211-2217) required competitive bidding; and since it had completed all work in strict accordance with the plans and specifications, it was entitled to receive the City's final acceptance, as certified by Godat.
Finally, in a letter of January 23, 1963, the City informed Pittman it would not accept the project; considered Pittman's refusal to submit a price for the remedial work as a breach of contract, and the City would proceed to advertise and award the remedial work.
Quoad Pittman, we have no doubt of the City's liability. As noted by the district *317 court, the City, in its answer, admitted "the contract documents required Pittman to perform the work in accordance with the City's plans and specifications;" acknowledged that lateral movement of the soil displaced many piles previously driven in the correct locations and positions in accordance with the plans and specifications; that Pittman had substantially completed the buildings and appurtenances under its contract with it; and that Godat, after a final inspection of the work, advised that the work had been satisfactorily completed.
All expert witnesses (Al Pittman, Ellzey, Blessey, Godat and Pepper) testified that the soil conditions were worse than anticipated. Al Pittman explained that the subsurface material was "so soupy it could be stirred with a paddle." Ellzey and Blessey agreed that the site was one of the worst in the New Orleans area. The evidence established that many piles were pushed over a considerable distance by the pressure of the lateral movement of the earth at a depth of about 12 to 15 feet. Under Godat's revised plans, 22 new pit piles and 87 new foundation piles had to be re-driven.
The specifications allowed the excavation to be performed either as an "open cut" or in a "braced cofferdam." Pittman elected the "open cut" method. Godat wrote Pittman that "the unwise positioning of earth moving equipment and spoil banks too close to the excavation, coupled with wet weather, caused a sliding of the excavation banks and the subsequent dislocation of an undetermined number of pit piles, and that careless use of excavating equipment in striking foundation piles had battered and dislocated a considerable number of these piles, and further damaged the concretefilled top portion of the composite piles supporting the building foundations."
Godat further advised Pittman that it was its responsibility to build the facilities contracted for in strict compliance with the plans and specifications, and that Godat's only responsibility was to the City, and was limited to see that the materials used and work performed were in strict accordance with the contract, plans and specifications.
The City now contends that Pittman is liable under LSA-R.S. 9:2771 because it failed to prove that the plans and specifications were deficient, even though it performed the work in strict accordance therewith.
Prior to LSA-R.S. 9:2771, the jurisprudence under LSA-C.C. art. 2758 reading:
"When the undertaker furnishes the materials for the work, if the work be destroyed, in whatever manner it may happen, previous to its being delivered to the owner, the loss shall be sustained by the undertaker, unless the proprietor be in default for not receiving it, though duly notified to do so."
was that a contractor will not be excused from his obligation by reason of unforeseen difficulties encountered in the work. O'Leary v. Board of Port Commissioners for Port of New Orleans, 150 La. 649, 91 So. 139; Picard Construction Co. v. Board of Commissioners, 161 La. 1002, 109 So. 816; Terrill Construction Co. v. Town of Pineville, 168 La. 894, 123 So. 611; and Jung v. Gwin, 174 La. 111, 139 So. 774.
A recent decision of this court, Pittman Construction Co. v. Board of Levee Commissioners, La.App., 169 So.2d 192, which held LSA-R.S. 9:2771 inapplicable and the contractor (Pittman) liable for remedial pile driving, is inapposite here. In that case, Pittman did not perform in accordance with the plans and specifications because his subcontractor drove the pilings beyond the "tolerance" allowed in the plans and specifications.
It would be untenable to construe the cited statute as imposing upon a contractor the burden of proving that plans and specifications, prepared by experts, were insufficient and defective, when all admit he has performed in strict accordance therewith, under the constant on-site supervision *318 and direction of the owner's experts. Such an interpretation would make the contractor the absolute insurer of the skill and ability of all architects and engineers employed by the owner to design the construction and prepare the plans and specifications and, in effect, would constitute a waiver of the immunity granted the contractor which waiver the statute prohibits.
In Barnhill Brothers, Inc. v. Louisiana Department of Highways, La.App., 147 So. 2d 650, the court, in holding a contractor was not responsible for cracks occurring in a bridge after its construction distinguished it from prior jurisprudence because LSA-R.S. 9:2771 was subsequently enacted immunizing the contractor from liability.
However, assuming arguendo that Pittman had to show a specific deficiency in the plans and specifications, Pittman has met the test, because all of the experts agree that the plans and specifications failed to show adequately the soil conditions that Pittman encountered; as the soil conditions were unforeseeable and the inadequacy was the fault of none of the parties. The fact remains that, as to Pittman, the plans and specifications were insufficient in this respect. Pittman, therefore, was not at fault. The appeal by Pittman quoad Whitty has been abandoned.
We must now consider the liability of Godat to the City under the latter's third-party action. Godat's employment as engineer to prepare plans and specifications and supervise the work of Pittman, warranted only that:
"THE ENGINEERS shall indemnify and save harmless the CITY, against any and all claims, demands, suits and judgments of sums of money, to any party, accruing against the CITY for loss of life or injury or damage to persons or properly (property) growing out of, resulting from, or by reason of any act or omission or the operations of work of the ENGINEERS, their Agents, Servants or Employees, while engaged in, or about or in connection with the discharge or performance of the services to be done or performed by the ENGINEERS hereunder, and shall also hold the CITY harmless in any and all claims and/or liens for labor, services, or materials furnished to the ENGINEERS, in connection with the performance of their obligation under this Agreement. * * *"
In the above provision of the contract Godat agreed to indemnify the City for the following only: (1) tort claims against the City for injury to persons or property resulting from Godat's activities; and (2) claims for labor, services or material furnished to Godat. It appears clear this provision was not meant that Godat indemnify the City for any contract claims Pittman might have against it. Assuming, arguendo, that this provision is ambiguous, it must be construed against the City whose attorney and notary prepared the contract.
Godat contends that the ordinary care and reasonable skill by which an engineer's preparation of plans and specifications is to be tested, in determining whether negligence was involved, must be the same care and skill required by others in the same profession in the locality in question, citing 25 A.L.R.2d 1085, and Bayshore Development Co. v. Bondfoey, 75 Fla. 455, 78 So. 507, L.R.A. 1918D, 889, in which the Florida Supreme Court, citing and quoting from the Maine case of Coombs v. Beede, 89 Me. 187, 36 A. 104, stated as follows:
"The responsibility resting on an architect is essentially the same as that which rests upon the lawyer to his client, or upon the physician to his patient, or which rests upon any one to another where such person pretends to possess some skill and ability in some special employment, and offers his services to the public on account of his fitness to act in the line of business for which he may be employed. The undertaking of an architect implies that he possesses skill and ability, including taste sufficient to enable him to perform *319 the required services at least ordinarily and reasonably well, and that he will exercise and apply in the given case his skill and ability, his judgment and taste, reasonably and without neglect. But the undertaking does not imply or warrant a satisfactory result. It will be enough that any failure shall not be by the fault of the architect." 78 So. 507, 509.
Further, use of the term "architect" is intended to cover "engineers" as well. 25 A.L.R.2d 1085, 1086. Paxton v. Alameda County, 119 Cal.App.2d 393, 259 P.2d 934, 938, holds that expert testimony is needed to establish lack of care and resulting negligence on the part of architects and engineers. For a thorough discussion of the pertinent cases from Louisiana and other jurisdictions on the standard of care applicable to the medical profession see Lejeune v. United States Casualty Co., 227 F.Supp. 191 (WD La. 1964). See also George v. Phoenix Assurance Co., 328 F. 2d 430 (CA 5 1964), rehearing denied, affirming 215 F.Supp. 340 (ED La. 1963).
The district judge, in his reasons for judgment against Godat on the City's third-party action, after concluding there was no evidence to support the City's defense against Pittman's claim that there was no defect in the materials or work furnished by it, and that Pittman did encounter unstable soil conditions during the progress of the work, then concluded that:
Lyman L. Ellzey, a civil engineer called by Pittman, testified that the soil conditions in the area were very bad, in fact the worst he ever saw, and were very unfavorable for this construction. Moreover, this expert stated that the design was normal and standard; that neither Godat's plans and specifications, nor Eustis Engineering Company's soil investigation report, indicated such bad conditions.
Moreover, in the opinion of Walter E. Blessey, the City's own structural engineering expert, the plans were prepared by Godat "in accordance with first-class engineering practice." With regard to the choice of using floating, rather than supported, slabs Blessey testified that although the site was the worst area for construction in New Orleans, the anticipated settlement was from 2 to 4 inches during a period of about ten years and not the approximately 3 inches that actually did occur within three or four weeks; and that the floating slab construction was justified in the light of all the circumstances, as he testified, viz:
"Q All of the knowledge that you have imported to us today would you have designed this project originally with floating concrete slabs?
"A * * * Now in the practice of the profession the floating slab is usually used for one thing economy reasons. You have pile supported slab and the floating slab, and in many cases the owner, if he's interested in his budget, he will take the floating slab rather than pile supported slab if it doesn't impair his main function or performance, and in the case of incinerator like this the use of a floating slab could be justified on the basis of let's say economics as understood with the owner."
Further, when the trial judge asked Blessey if he would have given the contractor the option of using the open pit method of excavation, Blessey answered as follows:
"A Well I would have usually left it up to the contractor, which has been my practice. In other words, I personally very rarely tell the contractor you can do it this way or that way. My own practice is that this is the contractor's responsibility."
The chief project design engineer for the Godat firm was Mr. Pepper. He, too, testified that the soil subsidence was much faster and more extreme than anticipated, and that the design provided for only nominal settlement of the ground under the floating concrete slabs of about 1/8 to 3/8 *320 of an inch, but the actual settlement was 2-1/2 to 3 inches.
Godat said he relied on the Eustis soils report as indicating that some slight settlement could be expected, but he candidly admitted he did not expect as much as three inches of settlement.
The district court concluded from the testimony of Pepper and Godat that they did not anticipate such unstable soil conditions; for which reason they made no allowance for extra-ordinary soil conditions in the plans and specifications.
In his December 12, 1962 letter to the City, Godat acknowledged that he did not expect or provide for such bad soil. In writing about the damage caused by the excessive settlement of the floating slabs, Godat admitted that Pittman had satisfactorily completed all its work; that Pittman was not responsible for "subsidence which takes place as a result of natural causes over which he can exercise no control;" that his firm approved Pittman's compaction of the sand under the slabs; that "hindsight has now proved our judgment in this case to be incorrect with the result that subsidence is greater than that anticipated;" and, that "in considering the subsidence which has taken place, it is our opinion that this subsidence is due, not to defective workmanship on the part of your contractor, but rather to natural causes which could not have been anticipated either by this firm or by the contractor."
In his January 28, 1963 letter to City Councilman DiRosa, Godat explains that he has discussed the possibility of excessive settlement with the City, and advised that the installation of pilings would cost between $16,000 and $18,000; that he estimated the subsidence would not exceed 3/8 of an inch but, if further subsidence should occur, the cost of correction might not exceed $3,000; following which the City concurred in the decision to install floating slabs. Further, in his letter Godat wrote: "* * * we were confronted with the fact that the appropriation required maximum economy in the design of the facilities to be constructed."
When questioned if he told the City officials it would be better if he had used a structural slab, Godat answered, "I think it was self-evident in our discussions that it would have been a betterment on the job."
It is clear that the City elected to take a chance on the possibility of excessive settlement in order to save the $16,000 to $18,000 cost of the pilings, and hence must be held to have assumed the risk.
Godat further testified that "despite the considered opinion of the soils expert, and our judgment based thereon, these slabs settled a maximum of approximately three inches, which caused the cracking of certain partitions carried thereon, and it is my opinion, substantiated by Mr. Blessey, that the plans and specifications, including the floating slabs, based on the soils' report, were entirely proper and consistent with today's engineering practice. Nonetheless, we regret the unanticipated and unpredicted settlement of the slabs and the attendant cracking of the concrete block partitions."
It is true that Godat was the engineer employed to prepare the plans and specifications and to supervise Pittman's work, and to that extent should be held to the highest standard of professional ability. The testimony of the experts is unanimous that the plans and specifications were proper; and that the site was not suitable for the erection of the disposal plant because of the uncertain soil conditions.
There is no charge here that the plans and specifications were such that the structure was either wholly or partially unfit for the purpose for which it was built. The only effect of the unknown soil conditions was to increase the cost of construction. The City selected the site; and in spite of Pittman's repeated entreaties *321 and recommendations that changes be made in the plans and specifications, the City's representatives first refused but finally gave their consent to such changes but refused to pay the additional cost because of the limited budget the City had for the structure. The City's representatives dealt at arm's length with Pittman and Godat and were kept fully informed at all times, during the preliminary preparations leading to the preparing of the plans and specifications and the contract, and all during the course of construction. When the City finally decided to have Godat revise the plans and specifications, Pittman agreed to do the work with the understanding that the City was responsible for the extra cost. Since the only result from the unknown soil conditions was the additional cost of the construction, we cannot see how Godat can be held liable on the ground of professional incompetency or negligence.
The district judge in his written reasons concluded:
"The court observes that this was an economy project, and that the limited budget imposed some restrictions on the engineering design of the project. In all probability, the explanation for some, if not most, of the construction difficulties is to be found in the efforts made to reduce costs in planning and constructing the incinerator.
"The City was forced to reject all bids received on June 21, 1961, because the lowest combination of bid proposals totalling $811,400 `materially exceeded the appropriation for the project.' The Godat firm was forced to revise the plans and specifications to cut building costs; and, the lowest combination of bids submitted on July 19, 1961, in response to the readvertisement, was $704,213, Pittman's $456,000 base proposal for the incinerator building work being the best bid.
"Apparently, the City's refusal to make necessary changes in the design and to provide appropriate change orders for modified construction after the serious latent unstable soil conditions were encountered was motivated by these same financial considerations.
"In their attempts to keep construction costs within the limited appropriation, the City's engineers apparently sacrificed sound engineering and construction practices."
In determining the liability of Godat, the same standard of care applied in the case of architects, physicians, attorneys, and others engaged in professions requiring the exercise of technical skill should be applied. The test is whether he performed his service in accordance with the skill usually exercised by others of his profession in the same general area; and the burden of proving he did not, is upon the party making the charge, in this case the City, third-party Plaintiff. The City has not discharged this burden here because all expert testimony vindicates the professional skill and judgment exercised by Godat in this case.
Accordingly, the judgment of the district court on the third-party demand in favor of the City of New Orleans and against Godat, d/b/a David W. Godat & Associates, for $60,360.94 is now reversed, and judgment rendered in favor of Godat dismissing the City's third-party action against him.
The judgment of the district court in all other respects is affirmed; all taxable costs of Pittman Construction Company, Inc. and David W. Godat & Associates, in both courts, to the extent the City is legally taxable therefor, to be paid by the City.
Judgment reversed in part and affirmed in part.