REID, Judge.
The Washington Parish Police Jury brought this action against Belcher & Son, Inc. and its bonding company, Standard Accident Insurance Company, for damages allegedly arising out of a building contract for the construction of a courthouse to be located in Franklinton, Washington Parish, Louisiana. Plaintiff’s original petition alleged that the glass work in said building was not properly installed in accordance with the plans and specifications furnished by August Perez & Associates, Architects of Orleans Parish, Louisiana, resulting in leaks during rainy weather, causing damages amounting to $15,000.00. Plaintiff *850 also asked for attorney’s fees in the amount of $2,500.00 A supplemental petition was later filed alleging additional damages in the amount of $10,000.00. Belcher & Son, Inc. filed a general denial and asked that the architects, August Perez & Associates, and the subcontractors, Ben Ferguson d/b/a Ben Ferguson Glass Company, Na-chary & O’Connor Company, Inc., and Western Waterproofing Company, Inc., be made parties defendant, and prayed in the alternative for judgment against them for the sum of any judgment rendered against Belcher and its bonding company. The suit was ultimately dismissed as to August Perez & Associates. Ben Ferguson Glass Company, Inc. was made a party defendant in the place of Ben Ferguson d/b/a Ben Ferguson Glass Company. After trial of the matter judgment was rendered in favor of the Washington Parish Police Jury and against Belcher & Son, Inc. and Standard Accident Insurance Company in the amount of $15,500.00 and interest, and in favor of Belcher & Son, Inc. and Standard Accident Insurance Company against third party defendant Ben Ferguson Glass Company, Inc. in the amount of $11,500.00 and interest, the costs to be paid one-half by Belcher and Standard Accident and one-half by Ferguson Glass. Belcher and its bonding company have appealed from said judgment.
There is no question but what the glass work in the building was improperly installed, and this question is not at issue.
There are, however, two questions at issue: (1) where the liability for the negligent installation of the glass lies, that is, was it the fault of the contractor and the subcontractor, or was it due to the fault of the architect in the preparation of the plans and specifications; and (2) the quantum of damages.
Appellants allege three specifications of error by the Trial Court:
“1. The court should have given legal effect to LA R.S. 9:2771.
2. The burden of proof was on the plaintiff to show sufficiency of the plans and specifications and the defective workmanship, and this it failed to do.
3. Damages should have been limited to the actual cost of repairing the defective work, instead of some speculative figure being affixed.”
LSA-R.S. 9:2771 reads as follows:
“No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.”
There is no question but what the Trial Judge gave effect to R.S. 9:2771, and the Trial Court did hold that the burden of proving the sufficiency of the plans and specifications and the defective workmanship was on the plaintiff owner. The issue is not whether or not the Trial Court gave effect to these matters, but is whether or not the finding of fact by the Trial Court in interpreting these two legal questions is correct.
The plaintiff bases its entire case on the testimony of August Perez, III, a member of the firm of August Perez & Associates who were the architects on the courthouse job. Mr. Perez testified that all of the damage or leakage was caused by the improper installation of the windows, particu *851 larly the improper placing of the stops. He testified:
“Q. What do you mean by improper placing of the stops?
A. They were reversed.
Q. In other words, as I understand your testimony they were inside and they should have been outside, is that correct?
A. There are two stops and the glass goes between them and one stop is so designed to be on the inside of the building and the other stop is so designed to be on the outside of the building and these stops here are in reverse. The outside stops are on the inside and the inside stops are on the outside.”
Mr. Perez testified that the strips or stops with the screws visible should be on the outside and that when they examined the windows they took off the strips (stops) and found that the strips which should have been on the outside were on the inside of the windows.
On cross examination, however, Mr. Perez admitted that his firm had had general supervision over the construction of the building and had accepted the building, but had not noticed that the stops were incorrectly installed. He was unable to testify as to whether or not all of the windows had been improperly installed as he had not examined them, but he stated that he assumed that they were. Although he said he could only assume that all of the windows were improperly installed, he had testified that the stops were installed in reverse and that this was something that could be readily seen with the naked eye in just going around the building, and he had to admit that he did not know why this situation was not caught while the building was being inspected during construction.
Section 15.04 of the Specifications for the Washington Parish Courthouse reads as follows:
“All workmanship to be of the highest quality and performed by mechanics skilled in fabrication of high quality architectural metal work. All joints, junctions and butting sections to be precision fitted. No gaps to occur between jointed sections. Screws where required shall be on the interior of the building.”
While Mr. Perez admitted that the quoted section specifically related to the windows in question, he got around that by saying that when the shop drawings were submitted by the subcontractor Ben Ferguson Glass Company, they showed the screws to be on the outside and that was the way his firm approved it.
Later in his testimony regarding the question of the proper caulking of the windows, which was also advanced as a cause of the damage but not by Mr. Perez, Mr. Perez stated that his specifications did not require caulking under the stops and that the shop drawings approved by his firm did not specifically show that any caulking would be done. He did admit that proper caulking was necessary for the proper installation of the windows and it can only be assumed from his testimony that the caulking was properly done. Again, while conceding that neither the specifications nor the shop drawings called for caulking under the stops, he indicated that the portion of the above quoted section of the specifications which says “all workmanship to be of the highest quality” would apply in this case.
Mr. John D. Belcher, Jr., who at the time of the construction of the courthouse was Construction Superintendent and a stockholder in the firm of the general contractor, Belcher and Son, Inc., testified that they had attempted to correct the leakage in the windows by recaulking them. Mr. Belcher also testified that approximately 50% of the windows were “installed with stops different from the others with the screws on the outside on some and on the inside of others” and that the leaks occurred on all of the windows. He further *852 testified that even though they had a copy of the shop drawings, they, the general contractor, did not have authority to approve any of the shop drawings, they only received the drawings after they had been approved by the architect; that the architect had supervision and as the general contractor he did not make detailed inspections or special effort to see whether or not the windows were installed correctly.
Mr. Marcus Edwin Ulrich testified on behalf of the defendant. He had been a glazer for about 32 years, having worked for Pittsburg Plate Glass Company for about 16 years. He did corrective work on the windows for Mr. Belcher by using a rubberized caulking. He testified that they caulked all of the windows. He agreed with Mr. Belcher that about half the windows were installed with the stops one way and half with the stops installed the other way, and that all windows were leaking. He further testified that the windows could be prevented from leaking even with the stops installed backwards; that he had installed them both ways and had never had them leak when properly caulked. He also testified that you could tell by just looking at the windows whether or not the stops were in backwards and that it was his opinion that the only improper thing was that the windows were not properly caulked.
Mr. Ben Ferguson, President of the third party defendant Ben Ferguson Glass Company, Inc., testified that the manufacturer of the aluminum frames, which were approved by the architect, did not recommend that any type sealer be put between the aluminum tubing and the stops. He said that the caulking compound used in installing the windows met the specifications of the architect. He further testified that all the stops were not installed uniformly, and when asked if he could tell the Court how many of the stops were installed with screws on the outside and how many with the screws on the inside, he replied:
“On the back bays there are nine pieces of glass, four of those pieces are aluminum windows and there are three pieces of black glass and two large panels of clear glass. The large panels of glass, clear glass, two of them out of the nine have the screws on the inside of the building.”
He further testified as follows:
“Q. Mr. Ferguson, were the stops in connection with these windows made by the same people that made all of the aluminum ?
A. Yes sir, Art Metals Company.
Q. Did they have a recommendation as to the placement of these stops ?
A. No sir, either way.
Q. In other words, according to their recommendations, the stops can be either with the screws on the inside or the outside of the window, is that correct?
A. Yes sir.
* * * * * *
Q. Is it your interpretation of your shop plans and specifications that these stops could be on either side?
A. Yes sir. Would you like for me to show you where I get that opinion?
Q. Yes sir, I think that would be good.
A. You see you have got a number 5, that is Section 5 and you can look at 5 this way or you can look at 5 that way and therefore they could be on the inside or the outside. It doesn’t make any difference.
Q. Mr. Ferguson, you mean when you look at — from either side of the window on these plans, which are your shop plans noted Section 5, looking at it from either way you don’t know which side the stops with the screws should be on, is that correct ?
A. That is correct. The plans on Section No. 5 does not show which is outside and which is inside.”
*853 Mr. Ferguson further stated that the shop plans were drawn merely to show how the stop was applied to the tube. In rebuttal Mr. Perez stated that an examination of the plans, under Sections 7 and 9, showed the difference between the inside and the outside.
Mr. Charles White, employed by Ben Ferguson Glass Company, Inc. to install the glass and aluminum work in the courthouse, testified that the windows were installed according to the plans and specifications and the shop drawings.
It is apparent from a review of the testimony that the Trial Judge must have based his opinion on the testimony of Mr. Perez as to the improper installation of the stops. It is also apparent from the testimony of Mr. Perez that this was the sole deviation from the plans and specifications.
Under the provisions of LSA-R.S. 9:2771, to hold a contractor liable there must be no fault or insufficiency in the plans and specifications. The testimony in this case is overwhelming to the effect that the defects were due to fault, or more correctly to the insufficiency of the plans and specifications. Neither the plans, specifications nor shop drawings were clear as to how the stops should be installed. Taking this into consideration with the facts and evidence that it made no difference which way the stops were installed because all of the windows leaked, and that the architect could have easily seen that the stops were incorrectly installed, it is clear that the plaintiff has failed to meet the test provided by R.S. 9:2771. This would also be true in connection with the question of proper caulking. It is admitted by the architect that neither plans and specifications nor shop drawings made any provisions for caulking under the stops, and it is not the opinion of this Court that a general clause of “all workmanship to be of the highest quality” would bring this defect under the provisions of R.S. 9:2771.
In the case of Pittman Construction Co. v. City of New Orleans, La.App., 178 So.2d 312, referring to R.S. 9:2771 the Court said:
“It would be untenable to construe the cited statute as imposing upon the contractor the burden of proving that plans and specifications, prepared by experts, were insufficient and defective, when all admit he has performed in strict accordance therewith, under the constant on-site supervision and direction of the owner’s experts. Such an interpretation would make the contractor the absolute insurer of the skill and ability of all architects and engineers employed by the owner to design the construction and prepare the plans and specifications and, in effect, would constitute a waiver of the immunity granted the contractor which waiver the statute prohibits.”
While it is true that in this case the architect attempts to show that the work was not done in compliance with certain shop drawings which he said superceded the specifications but which contention does not seem to us to be well met, nevertheless, the evidence clearly shows that the plans and specifications were wholly prepared and written by the owner’s architect, the owner’s architect had constant supervision and control over the work in progress, and the evidence clearly indicates that had all the stops in question been placed as the architect stated they should have been placed, the windows still would have leaked. It is, therefore, the opinion of this Court that the facts herein fit the rule set forth in the Pittman case. See also Barnhill Bros., Inc. v. Louisiana Dept. of Higways, 147 So. 2d 650, where this Court held that the Department impliedly warranted the sufficiency of its plans and specifications and the contractor who complied therewith was not liable for defective work which had to be done over.
For the foregoing reasons the judgment of the Trial Court insofar as it awards damages for the improper installation of the windows and the resultant damages to floors, ceiling and drapes should be reversed.
*854 With regard to the Trial Court’s award of damages for repairing the bridge passageway from the courthouse to the jail, Mr. Perez testified that damage and leakage was caused by the incorrect installation of the flashing on the joint between the exterior wall and the roof and that such installation was not done in accordance with the plans and specifications. This testimony is not contradicted by any other testimony, and in the absence of any contrary testimony this portion of the award will be allowed.
For the above and foregoing reasons the judgment of the Trial Court is reversed in part and affirmed in part and it is ordered, adjudged and decreed that there be judgment in favor of the plaintiff and against the defendant Belcher & Son, Inc. in the amount of $2,000.00, plus interest from date of judicial demand until paid, and all costs, including this appeal. In all other respects the judgment of the Trial Court, including the third party demand, is reversed.
Reversed in part and affirmed in part.