401 So.2d 483 (1981)
The SEGALL COMPANY, INC., Plaintiff-Appellant,
v.
W. D. GLASSELL COMPANY, INC., Defendant-Appellant.
No. 14552.
Court of Appeal of Louisiana, Second Circuit.
June 8, 1981.
*484 Freyer & Fox by Sam A. Freyer, Shreveport, for plaintiff-appellant.
Whitmeyer & Glassell by Stephen A. Glassell, Shreveport, for defendant-appellant.
Before PRICE, MARVIN and FRED W. JONES, Jr., JJ.
FRED W. JONES, Jr., Judge.
Plaintiff subcontractor sued the general contractor for the balance allegedly due for the installation of a heating and cooling system. Defendant denied any indebtedness and reconvened for the cost of corrective work allegedly necessitated by plaintiff's faulty design of the heating and cooling system. The trial judge found for plaintiff on its main demand and for defendant on the reconventional demand. Both parties appealed.
The record shows that W. D. Glassell Company, Inc., ("Glassell") is a general building contractor engaged primarily in the business of designing and constructing pre-engineered metal buildings. In this case Glassell entered into a preliminary agreement with James W. Morton to construct an office building in Shreveport to be occupied by a company of which Morton was the chief executive officer. As was its business practice, Glassell then solicited bids for subcontract work from various subcontractors. Among the latter was The Segal Company, Inc. ("Segal"), which had been in the business of installing heating and cooling systems since 1949.
*485 After Segall presented a competitive bid for the installation of plumbing as well as the heating and cooling system, Glassell directed that it eliminate the plumbing portion of the bid. Glassell furnished Segall with a floor plan of the proposed building, informed it of the tonnage size of the units (one 10 ton and one 4 ton) which Glassell intended to use, and requested that Segall sketch or draw on the plans a design showing proposed duct work and vents for the heating and cooling system. Segall complied with this request. Following further negotiations the parties agreed upon a subcontract price and, in due course, Segall completed the installation of the system as shown on the plans submitted in connection with the negotiated bid.
The personnel of Morton's company occupied the building in September 1978. Soon thereafter Glassell began receiving persistent complaints that the heating and cooling system was not functioning properly. When Segall demanded the balance due on his contract. Glassell refused payment, explaining that Morton was retaining $7400 on the general contract because of Segall's defective work.
The parties appeared to reach an impasse after repeated efforts to remedy Morton's complaints proved futile. Finally, Glassell hired an engineering firm to make an independent evaluation of the heating and cooling system, note defects and make suggestions for corrective work. Dennis Fisher, a mechanical engineer, inspected and tested the system, finding in essence that the proper amount of air was not blowing into each room to keep it comfortably heated in cool weather and cooled in warm weather. The most acute problem was found in the two end offices, one of which was used by Morton and the other by another executive officer. Fisher recommended that two corrective measures be taken and Segall promptly complied. First, a return air grille determined to be undersized was replaced with a larger grille. Second, a belt-driven blower package was installed in the 4 ton unit to increase the air flow from that unit. After these steps were taken and the system was balanced, Fisher found that it was performing satisfactorily in all rooms of the building except the two end offices which had temperature variations of from three to four degrees from the remainder of the building. As Fisher pointed out, a particular complication here in the summer was that these offices had exterior walls which caught the full impact of the morning sun.
Fisher finally concluded that the only way to solve this problem to Morton's satisfaction was to install a separate unit to heat and cool the two end offices, with placement of the thermostat where it could be controlled by Morton. Pursuant to this recommendation Glassell purchased and had installed a 3 ton unit to service the two end offices and an adjoining computer room, with the thermostat and four outlets placed in Morton's office, at a cost of $3852 to the general contractor.
At the trial of this matter the judge found that Segall had proven entitlement to the balance due on its contract, but that Glassell was entitled to an offset for amounts expended by it to remedy problems caused by Segall's defective design of the heating and cooling system.
Since the most substantial issue posed by this appeal involves the merits of Glassell's reconventional demand, we consider that question first.
La.Civil Code Article 2769, which governs disputes of this nature, provides:
"If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract."
As pointed out in Barraque v. Neff, 202 La. 360, 11 So.2d 697 (1942):
"The architect who prepared the plans and specifications of a building, and afterwards became the contractor and agreed with the owner to put up the building according to plans and specifications, is responsible for any defect or insufficiency in specifications. He cannot *486 escape responsibility for defectiveness of the work by taking the ground that the defect was in the specifications and not in the work. He is responsible for both."
Addressing the question of the duty owed by architects, the court in Maloney v. Oak Builders, Inc., 224 So.2d 161 (La.App. 4th Cir. 1969) explained:
"Architects and engineers are held liable for damages incurred by the owner by whom they are employed when their plans and specifications are faulty and defective as a result of their neglect to exercise care and skill. However, in the absence of an express contractual provision to the contrary, an architect's obligation does not imply or guarantee a perfect plan or a satisfactory result, and there is no assurance that miscalculations will not occur. Liability is considered to rest only on unskillfulness or negligence and not upon mere errors of judgment. Moreover, the ordinary care and reasonable skill by virtue of which engineers' or architects' preparations of plans and specifications is to be evaluated in determining whether they are guilty of negligence, must be that same care and skill required by others engaged in the same profession in the same locality...."
The burden of proving that an architect or engineer did not perform his work in accordance with the skill usually exercised by others of his profession in the same general area is upon the party making the charge. Pittman Construction Co. v. City of New Orleans, 178 So.2d 312 (La.App. 4th Cir. 1965).
In this case there is no serious complaint that Segall installed defective materials or that its work was not performed in accordance with the layout as designed. With reference to the complaint that the Segall plans for the system were defective, we note the following colloquy between Segall's counsel and Fisher, the expert upon whom Glassell relied to prove its charge of negligence:
"Q. Now, you saw the duct layout there?
A. Uh-huh. If what you're saying: Do I find it inadequate, no, I didn't. I felt like it followed the normal design parameters. I believe I told everybody at the time I thought the duct work and design was within industry standards.
Q. Within industry standards? Did you observe any defect of material
A. No.
Q. used out there? Did you observe any factors that would lead you to believe there was faulty workmanship done in the installation of it?
A. No."
Actually, the real basis of the reconventional demand is not that Segall (represented by its president, a mechanical engineer) designed a defective system, but that it should have anticipated the possible necessity for a separate unit to heat and cool the two end offices and should have offered that as an alternative bid for acceptance at the owner's option.
In resolving this issue we find it significant that Segall was not charged by Glassell with the full responsibility of designing a system which would heat and cool the planned structure, including recommending the size units Segall believed would adequately provide the necessary heating and cooling. On the contrary, the subcontractor was instructed to design a system based upon the size and placement of units previously chosen by Glassell. Fisher conceded that this was an important role distinction when he was asked:
"... Is, in your opinion, there a difference between the function of a mechanical engineer employed to design a unit for heating and cooling a building and the function of a mechanical engineer employed to submitting a competitive bid for implementing the installation and purchase of units, the size of which and location of which had already been specified; is that the same job, or is that two different jobs?
and answered: "That's two different jobs."
At no time did Fisher testify that Segall, by not suggesting or recommending an independent *487 unit in connection with its subcontractor's bid, failed to exercise the care and skill required of other mechanical engineers in the Shreveport area.
The floor plan of the proposed construction, furnished to Segall by Glassell, did not contain detailed information bearing directly upon the adequacy of the heating and cooling units specified by Glassellsuch as roof and wall insulation, size of windows, and whether windows would have draperies. Under these circumstances it would have been unrealistic to expect Segall to recognize the inadequacy of the units Glassell, whose president was a civil engineer and experienced general contractor, had decided upon. Consequently, this case is factually distinguishable from Co-operative C. Stor. Bldrs., Inc. v. Arcadia Foods, Inc., 291 So.2d 403 (La.App. 4th Cir. 1974) which held that a contractor was chargeable with knowledge that plans were faulty and under a duty to warn the owner of the defect.
Turning to the practical problems involved in satisfying the occupants of office buildings such as this with reference to heating and cooling, Fisher was asked if it was "possible for a long stretch of offices with varied usages and with changing usages during the course of the day and the weeks, and with varying exposures, to have the identical temperature in every office throughout the day from one thermostat, wherever located?" His answer was: "Impossible."
Glassell's president was asked if the first remedial work performed in accordance with Fisher's recommendations was effective. His answer is enlightening:
"The larger fan kept the back offices rather comfortable, but I think by then what had happened was that the owner would not have been satisfied with anything." (emphasis added)
As it later developed, Morton was satisfied after installation of the separate unit.
In summary, with reference to the reconventional demand, we find that Glassell proved that the heating and cooling system was not performing satisfactorily; that an undersized return air grille had been installed; that the air flow from the four-ton unit was 30 to 40% below what it should have been; and that the entire system needed to be properly balanced. Glassell was justified in securing the services of a consulting engineering firm to independently evaluate the system. Therefore, the trial judge correctly assessed Segall with the $386.70 paid by Glassell to that firm for its services.
On the other hand, Glassell did not discharge its burden of proving that purchase and installation of the additional three-ton unit was due to defective plans prepared by Segall. Further, Glassell did not prove that Segall's failure to offer as an option or to recommend the installation of a separate unit to heat and cool the two executive offices constituted a dereliction of its duty under the circumstances of this case. Consequently, we find that the trial judge erred in assessing Segall with the cost of this unit, the expense of installing the unit and the lost time experienced by Glassell incidental to its efforts to satisfy the building owner in this respect.
On the main demand Glassell contends that Segall presented no evidence to prove that it was owed anything on the subcontract. The record contains testimony by plaintiff's president reciting the percentage of the original subcontract price which had not been paid. The trial judge apparently accepted this as proof of the balance due and we find no error in this finding.
In its appeal Segall complains that the trial judge failed to make an award for the items listed in the amended and supplemental petition. As Glassell correctly points out, the record indicates that most of those claims involved work performed in connection with maintenance or warranty and are non-reimbursable. However, Glassell concedes that Segall is entitled to recover for the installation of locking covers on thermostats ($83.14) and a service trip ($20.89) on January 3, 1979.
For the reasons set forth, the judgment of the trial court is amended and recast to read as follows:

*488 "IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, The Segall Company, Inc., and against the defendant, W. D. Glassell Company, Inc., for the sum of $4289.10, with legal interest on $3902.40 from date of judicial demand until paid.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff-in-reconvention, W. D. Glassell Company, Inc., and against defendant-in-reconvention, The Segall Company, Inc., for the sum of $386.70."
All court costs, both in the district court and on appeal, are assessed one-half to Segall and one-half to Glassell.
As amended the judgment of the district court is affirmed.