|,MIRIAM G. WALTZER, Judge.
STATEMENT OF THE CASE
Allen H. Borne, Jr. filed suit in 1997 for damages allegedly sustained as a result of the professional malpractice of zoning consultant Raymond M. King. Borne alleged that he entered into a contract with *855 King to assist in the rezoning of Borne’s property at 4401 South Broad Street for use as professional offices with general business use on the first floor of the building. Borne alleged that King misrepresented the progress of the zoning process, was negligent in the conduct and handling of the matter and acted beyond his authority by failing to report to Borne the City Council’s offer of an alternative commercial zoning for the property. King answered denying liability and filed a reconventional demand for the balance due under the contract. Borne answered with a general denial.
The matter was heard by the trial judge, who rendered judgment on 26 September 2000 in favor of King on the main demand and in the amount of $1,428.75 on King’s reconventional demand. Borne appeals from that judgment. We affirm.
I «STATEMENT OF FACTS
King does not hold a license, and there is no evidence that there is a licensing agency or professional organization for “zoning consultants.” Borne is a sophisticated attorney who is also engaged in the real estate business.
On 8 February 1996, Borne and King entered into a contract that provided in pertinent part:
The Client [Borne] is contracting with Raymond M. King, Consulting to provide assistance in acquiring rezoning of the above described property.
The zoning change from RD-2 to Bl-A (Commercial) to conform with the practice of zoning lots intended for use as a restaurant in a residential district. Raymond M. King Consulting and Services will use its best efforts to assist Mr. Borne in achieving this zoning change. Mr. Borne understands that the services herein agreed to do not necessarily guarantee the acquisition of the zoning change, and that payment for services is based on time spent pursuing the required legislation, and not on the outcome of such efforts.
[King] will invoice Mr. Borne at a rate of $45.00 per hour for all time spent on this project, and for reasonable expenses that may be associated with work on the client’s behalf. Invoices will be provided every 30 days, due and payable within 5 days following presentation.
The trial court in its reasons for judgment found that the contract specifically states King was to assist Borne in having his property rezoned from RD-2 to Bl-A, no other designation having been considered in the contract. Furthermore, the trial court found the contract did not guarantee the desired zoning would be obtained nor did it require King to seek alternative commercial zoning. The court also found that Borne was aware of the lack of control an outside party may have in governmental zoning decisions. He found that King used his best efforts to fulfill [ 3his contractual duty and was not negligent in his performance. The court found that King is entitled to payment of $1,428.75 as the balance due from Borne under the contract.
The parties stipulated to the following exhibits:
1. City Planning Commission Preliminary Staff Report of 5 September 1996 recommending modified approval for a map change to RO-1 General Office, subject to seven restrictions;
2. City Planning Commission Staff Report of 11 September 1996, which outlined the course of the public hearing that resulted in the CPC’s denial of Borne’s application;
3. City council Motion No. M-96-665 of 3 October 1996 upholding the CPC’s denial of map change from RD-2 Two Family Residential to B-1A Neighbor *856 hood Business District, which passed on a 7-0 vote.
4. Facsimile message from King to Borne dated 4 October 1996 which said in pertinent part, “We were denied. The councilman motioned to uphold the planning commissions [sic] recommendations. I think our next step is to file an appeal with Civil District Court ... Especially since you know the judges. However, Oliver can submit a motion for the planning commission to rehear this matter. Let me know your decision, (ps [sic] The attached letter is what I’ve delivered to the councilman this morning.)”
5. Letter from King to Councilman Thomas dated 3 October 1996 which said: “I was extremely disappointed with the results of docket 9%7 today. From total approval to complete denial of the petition OVERNIGHT. I’m beginning to believe that there is no way a person can get into business in this city. Mr. Borne purchased this property with good intentions and in good faith with the neighborhood association. He has been blocked and lied to every bit of the way. Let me explain: 1) Mr. Borne purchased the property with an existing lease. Extended to 1999. 2) Mr. Borne had to commence eviction proceedings in civil district court in order to gain access to the property before commencing any action as regards zoning matters. 3) Legal-non-conforming use was attempted but everyone suggested a |4map change since Mr. Borne wanted to use both the upper and lower floors in his project. B1A [sic] was recommended. 4) Richard Allen of CPC staff was the person that changed the zoning to RO-1 in his recommendation to the planning commission. This and objections concerning legal-non-conforming use status by the residents was the reason for denial by that body. 5) Now we’re into October with a flat denial and no reasonable solution in site [sic] for Mr. Borne and his property. I think you will agree that the system is negligent. When someone can purchase a property that seems to be falling to neglect and attempts to create some neighborhood revitalization, and meets with these kinds of delays and opposition, something is wrong. I think you originally saw the need of revitalizing this corner but you allowed yourself to be swayed by a few of your constituents. Who pray tell will be the caretakers of this city if we allow people this kind of decision power? Are we to say to everyone “BEWARE — DO NOT PURCHASE PROPERTY IN THIS CITY! Think about the loss to the city of no-one will invest in it. In closing let me say that I’m more than disappointed, I’m sick over this thing. In addition, I feel as though I’ve lost a friend.”
6.Letter from Councilman Thomas to King that said: “I am also extremely disappointed with what happened concerning zoning docket 96-97. But I am most disappointed with the way you handled it and your total lack of regard for me and my neighbors. If you had taken the time and made the effort to meet with the neighborhood groups and build trust before putting in a final application with the City Planning Commission, then denial of this zoning petition would not have been necessary. Development of 4401 Broad in a manner suitable to the neighborhood could have proceeded. Mr. King, if it makes you feel better to blame everyone else then you can, but let me assure you no one else feels guilty. Mr. King, if you can say that now you feel you’ve lost a friend then to you I was never a friend anyway but simply someone in a position with a little influence that you felt you could use *857 when it was helpful to you. My father used to say that you find out who your real friends are in times of disappointment. At least, in your case, I now know. It’s amazing how you’ve forgotten all of the other times I’ve done my best to try and assist you.”
7. Memorandum of Agreement signed by Borne and King providing: “The Client is contracting with Raymond M. King, Consulting to provide assistance in | ñacquiring rezoning of the above described property. The zoning change from RD-2 to Bl-A (Commercial) to conform with the practice of zoning lots intended for use as a restaurant in a residential district. [King] will use its best efforts to assist Mr. Borne in achieving this zoning change. Mr. Borne understands that the services herein agreed to do not necessarily guarantee the acquisition of the zoning change, and that payment for services is based on time spent pursuing the required legislation, and not on the outcome of such efforts. [King] will invoice Mr. Borne at a rate of $45.00 per hour for all time spent on this project, and for reasonable expenses that may be associated with work on the client’s behalf. Invoices will be provided every 30 days, due and payable within 5 days following presentation.
8. Invoice from King to Borne for 63.5 hours at $45.00 per hour, totaling $2857.50.
9. Property survey dated 22 August 2000.
10. Plat of the property.
Borne testified that he is a practicing attorney who, in 1995, contacted a real estate agent and entered into an agreement to purchase property located at 4401 South Broad Street. At the time he purchased the property, he knew that it was zoned non-conforming Bl-A and was leased to a Time Saver convenience store that was not operating at the time of the purchase. Borne intended to use the 1500 square foot second floor of the property as his law office with a 2400 square foot commercial rental space downstairs. Borne testified that he “dabbled in real estate” and was familiar with Bl-A neighborhood business and RO residential office zoning classifications.
He entered into negotiations with a potential restaurant lessee who introduced him to King, a zoning consultant. The restaurant investors suggested that Borne retain King to have the zoning changed so that a downstairs restaurant and upstairs law office would be permitted uses. Subsequently, the restaurant 1 ^negotiations failed. By then, the building had lost its non-conforming status. Borne then contracted with King to assist in rezoning the property to allow commercial use downstairs with law offices upstairs. Borne testified that King sent him a revised contract, but “it was wrong” in an unspecified manner. According to Borne, he told King to send him a corrected contract, but did not receive a new contract.
King recommended that Borne should seek a map change to B-1A zoning for the entire building so that the zoning change would be permanent. According to Borne, King told him the City Planning Commission (CPC) and district councilman, Oliver Thomas, approved a change to Bl-A. Subsequently, King gave him a copy of the CPC Preliminary Staff Report recommending a change to RO-1, not B-1A. King concluded that RO-1 would fit his needs, since that classification allowed professional officers, photo studio, sales office or the like. Bl-A is a less restrictive classification, allowing fast food, convenience store, laundromat and a large restaurant and bar operation. These uses are not permitted under the RO-1 classifica *858 tion. King recommended that Borne should seek Bl-A, because Councilman Thomas supported that classification and Bl-A would allow more flexibility in usage and required less parking. King recommended that Borne not attend the City Planning or City Council meetings, and leave the representation and negotiations to King.
The day after the council meeting, King advised Borne that the city had “double-crossed” them, and that he should sue the city. Borne testified that he called Councilman Thomas, who told him the “fiasco” was Borne’s fault for being “hard-headed” and insisting on the B-1A classification when the council was prepared to accept the RO classification. Borne then arranged a meeting with |7King, Councilmen Thomas and James Singleton, and himself, following which Councilman Thomas arranged a meeting with neighborhood representatives. In the meantime, the building had lost its nonconforming status and the neighbors took a “hard line” and wanted nothing but residential uses.
According to Borne, King never suggested that RO-1 had a 3,000 square foot limitation on the entire building. King’s reasons for having insisted on applying only for B-1A zoning were: (1) Councilman Thomas was in favor; (2) the classification was more flexible as to usage; and (3) the parking requirements were less than those set forth in RO-1.
Borne testified that had King told him that B-1A was not attainable, he would have accepted RO-1. Within that classification, he could have had his upstairs office and would have achieved a return on investment from commercial usage downstairs. Following the failure of the zoning change, the downstairs remained vacant and the upstairs was rented as an apartment for $1,000 per month.
Borne concluded that he relied fully on King’s advice and expertise.
On cross-examination, Borne identified a letter from King to Councilman Thomas expressing his extreme disappointment with the outcome, describing it as “From total approval to complete denial of the petition OVERNIGHT.” (emphasis in the original). Borne also admitted that he contracted with King to apply for a change to Bl-A zoning. He testified that the proposed but unsigned agreement submitted by King after the original restaurant proposal failed did not change King’s mandate to apply for Bl-A zoning.
Borne admitted having received an electronic message from King on 4 October 1996, just after the city council’s decision, that read:
jsI think our next step is to file an appeal with the Civil District Court. Especially since you know the judges....
However, Oliver can submit a motion for the planning commission to rehear this matter.
Borne testified that he reapplied in October, 1999, seeking an RO-1 classification, for only office use. This application was approved by the CPC but denied by the city council.
Borne admitted having received an invoice from King for 63.5 hours of services totaling $2,857.50 that remained unpaid.
Paul May testified that he was zoning administrator for the New Orleans Department of Safety and Permits from 1981 to 1999 when he became director of the Department. According to May, B1 A zoning was created for the Magazine Street corridor to accommodate its large structures, lack of parking and wide variety of uses. The RO-1 classification was originally designed for Canal Street near Jefferson Davis Parkway as a more restrictive dis *859 trict in terms of usage and bulk requirements. With CPC and City Council approval, RO-1 could be applied anywhere in the city. According to May, his Department interprets RO-l’s three thousand square foot limitation as applicable only to general retail stores, and not to office uses. According to Item 21 in the RO-1 description, “Stores or shops, unless otherwise prohibited herein, for the conduct of a retail business and occupying not more than 3,000 square feet of floor area” are permitted. The description did not include a size restriction for professional offices.
May recalled that the zoning docket at issue in this case was very controversial, but had nothing to do with the specifics of the CPC recommendations. He met once or twice with King, and discussed the problem. He did not recall having told King that there was an RO-1 blanket 3,000 foot | ¡¿imitation, regardless of the number of stories to the building. May testified that he recommended to King that he pursue the project as a Bl-A designation, and did not recall that the CPC recommended RO-1 zoning.
Stephen Donald Villevaso, a former New Orleans assistant city attorney, professor of zoning law and land-use law at the University of New Orleans’ College of Urban and Public Affairs and zoning and urban planning expert, testified for the defense. He testified that if Borne had come to him with the uses he intended for his property, he would have advised application for B-1A zoning. Not only were the square footage requirements for B-1A less restrictive than those for RO-1, but B-1A allowed for conditional uses, providing additional flexibility with respect to usage. This differs from a nonconforming use which exists when an owner has a legal right to use property for a given purpose that was lawful prior to a change to a more restrictive zoning classification.
Villevaso testified that in his experience, the RO-1-3,000 square limit was not restricted to retail uses, but would apply as well to Borne’s intended uses. This interpretation coincides with the conclusion of the CPC in this case. According to Ville-vaso, the traditional application of restrictions in a zoning classification to a piece of property is that it applies to the site and runs with the land. When one reads the RO-1 preface, it clearly limits floor area to 3,000 feet. Furthermore, RO-1 has more restrictive parking, setback, side yard, rear yard and front yard requirements.
The CPC staffs recommendation to approve only RO-1 zoning was subject to seven restrictions, the first of which was CPC approval of the floor plan depicting the location and square footage of all uses in the structure. Villevaso opined that this was particularly significant in light of the CPC staff analysis which 11f)noted, “The RO-1 district has a 3,000 square foot limitation with no conditional use option.” The staff analysis referred to a 3,000 square foot maximum, not to a 3,000 square foot PER FLOOR maximum as contended by Borne.
Villevaso testified on cross-examination that a zoning consultant has an obligation to keep his client apprised of the options open to him in the various kinds of zoning arrangements that can be made, and that this duty is greater when the client is not present at the CPC or council hearings.
Plaintiff offered the testimony of William G. Wiegand, Jr., MAI, RM, an expert in real estate appraisal. He valued the property on 3 October 1996, zoned RD 2, at $65,000.00. If zoned RO-1, the value would be $151,000.00. He calculated the lost income from the office space portion of the property from 3 October 1996 to the date of trial, 29 August 2000, to be $52,000. Wiegand testified that he was able to lay out eight parking spaces on the site. Wie- *860 gand admitted on cross-examination that RO-1 requires one space for every 400 square feet of building floor area. Based on 3933 square feet of floor area, ten spaces would be required.
Kang testified that having reviewed Borne’s wishes and the requirements of both B-1A and RO-1 zoning, he concluded that RO 1 was inappropriate. King testified that in his previous conversations with May, May told him that RO-1 was designed only for the Canal Street area, as stated in its preamble, and would not apply to Borne’s building. King also testified that he had no reason, prior to May’s testimony at this trial, that May would not interpret the 3,000 square foot limitation found in the RO-1 zoning to refer to total building floor area, and to apply only to retail uses. In addition to the 3,000 square foot limitation, the side and front yard setbacks did not fit Borne’s building. He strongly believed that, in 1996, even if Inthe property had been re-zoned to RO-1, May’s Safety and Permits Department would not have granted a use and occupancy permit because of the property’s failure to comply with these setback regulations. Furthermore, his earlier meetings with Councilman Thomas convinced him that he would accept the B-1A zoning. On the day prior to the council meeting, the councilman’s opinion apparently changed. King testified that when it appeared that the council would deny the application for Bl-A zoning, 'he asked the council to defer action to allow Borne to come forward with different recommendations and different concerns. He hoped Borne could meet with Councilman Thomas and perhaps apply for B 2A or C 1A zoning. King denied that Councilman Thomas had ever agreed to support a change to RO zoning.
During cross-examination, King identified an application filed on 5 August 1996 for RO zoning for the subject property under the same zoning docket number. He testified that his further research indicated RO was not an appropriate zoning classification for the property, so he filed an application for a change to Bl-A. King denied that anyone had ever suggested to him that the CPC or council would approve RO-1 zoning for the property.
STANDARD OF REVIEW
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100, p. 4 (La.1/16/96), 666 So.2d 612, 614. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Where the factfin-der’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually l^never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
We are instructed that before a fact-finder’s verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314. Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts [1], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court’s verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department *861 Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
liaFIRST AND SECOND ASSIGNMENTS OF ERROR: Defendant’s performance as a zoning expert, consultant and representative fell below the standard of care and skill usually exercised by an ordinary prudent zoning expert consultant and representative. Defendant failed to keep his client properly informed of the progress of the zoning application.
In determining the liability of a professional consultant, the test is whether he performed his service in accordance with the skill usually exercised by others of his profession in the same general area, and the burden of proof is on the party charging negligence. Pittman Const. Co. v. City of New Orleans, 178 So.2d 312, 321 (La.App. 4 Cir.1965).
In support of this assignment of error, Borne argues that King’s analysis of the RO-1 zoning classification was erroneous. King testified that the property with Borne’s suggested uses would not qualify for the RO-1 designation because (1) the classification was designed to apply to Canal Street only; (2) the property’s available parking and set-back areas were inadequate; and (3) the building’s floor area exceeded the 3000 square foot limit for RO-1 classification.
In opposition to King’s opinion, Borne offered May’s testimony to the effect that (1) if the CPC and city council agreed (clearly by no means a certainty under any conditions, but particularly unlikely in light of the controversy engendered in the neighborhood by Borne’s plans) RO-1 could apply outside of Canal Street; and (2) the floor area limit applied only to retail uses. May did not contradict the parking and set-back issue that King believed would defeat the zoning, absent a | Usuccessful waiver application to the Board of Zoning Adjustment (BZA). King’s position was also confirmed by his expert witness, Villevaso. Borne offered no proof that it was likely that the BZA would grant the waivers.
Applying the manifest error standard of review, we find a reasonable basis for the trial court’s decision to accept the testimony of King and his expert as to whether King’s interpretation of the RO-1 zoning was correct and reasonable.
Borne also argues that King was negligent for having failed to advise Borne of the progress of the zoning petition and of the changing positions of the district councilman. Borne contends that King failed to communicate the district councilman’s apparent willingness at the council meeting to support re-zoning as RO-1. However, in light of King’s reasonable opinion that such a designation would not allow for Borne’s intended use of the property, the councilman’s purported offer of an RO-1 designation is irrelevant.
These assignments of error are without merit.
*862 THIRD ASSIGNMENT OF ERROR: The object of the consulting contract was plaintiffs intended uses of the property.
Borne argues that the contract mandating King to use his best efforts on Borne’s behalf to change the property’s zoning classification from RD 2 to B-1A was not the contract out of which this ■matter arises. However, Borne introduced no other contract between the parties, oral or written. If, as Borne suggests, the object of the “new” contract (of which there is no evidence) was commercial use of liBthe property, under King’s reasonable interpretation of the RO-1 requirements, the RO-1 designation would not produce Borne’s desired result. Even if we were to reject the trial court’s implicit finding rejecting May’s interpretation of RO-1, it remains clear that the property’s lack of required parking area and setbacks would prohibit Borne’s intended uses even under RO-1 zoning. Absent any evidence that the BZA would have granted the required variances, in light of the strong neighborhood opposition to Borne’s project, we find no manifest error in the trial court’s rejection of this argument.
This assignment of error is without merit.
CONCLUSION AND DECREE
For the foregoing reasons, the judgment of the trial court is affirmed, and costs of this appeal are assessed against the appellant.
AFFIRMED.
PLOTKIN, J., dissents with reasons.

. See, LSA Const. Art. 5, section 10(B).